*MATTER OF THE COMPLAINT, CHARGES AND SPECIFICATIONS AGAINST CHARLES A. PALMER, AN ATTORNEY AND COUNSELOR AT LAW.

**1. POWER OF COURT TO REINSTATE.**

The court which disbars an attorney has power, upon motion and for good cause shown, at any time, to modify its order or to reinstate him.

**2. GROUNDS FOR REINSTATEMENT.**

Such order should not be modified or set aside unless the court is satisfied upon consideration of such attorney's life and conduct prior to his disbarment, and the reasons for such disbarment, that his life and conduct for a reasonable length of time since said disbarment, have been such that his restoration to the bar will not be incompatible with a proper respect of the court for itself, and a proper regard for the dignity of the profession.

ON MOTION to modify and vacate order of disbarment.

STEWART, C. J.

At the November (1894) term, the following motion was filed in this cause:

"Now comes the said Charles A. Palmer, and moves the court to modify and vacate the judgment and order heretofore made by this court removing him from his office as an attorney and counselor at law.

"1. Because O. H. Saxton, whose testimony in the case of Martin Plymire was admitted and used against Palmer, was, at the time he gave such testimony, an insane man, and not responsible for his statements, and who, soon after the trial of said Palmer, died from the mental derangement under which he was laboring at the time he testified in the Plymire case.

"2. Said Palmer's conduct since his removal renders him worthy of restoration to his said office.

"3. For other reasons, as will fully appear on hearing of this motion."

In support of this motion the said Palmer submitted the bill of exceptions taken in the disbarment proceedings, which contains all the evidence heard by this court at that time, except that upon the third charge and specification. As to that charge and specification the court found that in the proceeding referred to, said Palmer had testified falsely, but as there was some doubt as to his having so testified willfully, the court held said charge and specification not proven.

Also, some affidavits as to the mental and physical condition of O. H. Saxton, at the time referred to in subdivision one of the motion; some letters from members of the bar of Highland, Fairfield, Franklin and Fayette counties, in support of the second subdivision of the motion, and his own statement in support of the third subdivision. This embraces all that was submitted to us upon this motion, except the affidavit of one J. D. Stuckey, that said Palmer, before the hearing of the disbarment case, had "indignantly refused to square himself with the parties pushing those proceedings," and a certified copy of a judgment rendered by Hon. WELLINGTON STILWELL, in the court of common pleas of Coshocton county, Ohio, restoring one Charles Hay to his office of attorney at law seven years after his disbarment.

As to the first subdivision of this motion, it is sufficient to say that O. H. Saxton was not examined as a witness in the disbarment proceedings, although said Palmer asked a continuance of that case in order that he might obtain his testimony; and that the only reference to the testimony of Saxton in the case of *Plymire* v. *Saxton*, or quotation from it, during the disbarment proceedings, came from said Palmer, and was to the effect that he allowed the testimony of Saxton

---

*This decision was reconsidered and sustained in 8 Circ. Dec., 508, in which case the court declined to reinstate Palmer.

that "he (Saxton) and Palmer had divided the money out of which they had defrauded Martin Plymire," to go uncontradicted because his associate counsel in that case asked him to do so. It further appeared that notwithstanding said testimony of Saxton, which Palmer claimed was false, he not only did not withdraw from the case, but continued to act as Saxton's counsel until his death. As therefore none of Saxton's testimony in the Martin Plymire case was introduced in the disbarment case except as above, Saxton's condition at that or any other time affords no reason for disturbing the finding.

The letters written in support of the second subdivision of this motion can only be accounted for because the writers never knew anything of the testimony adduced on the hearing of the disbarment proceedings, or have forgotten what it was in the short time that has elapsed since that trial. Indeed they seem to have been written with the idea that an appeal for sympathy for those who are dependent upon said Palmer ought to be received as evidence that there is a reason for setting aside our former judgment. None of the writers claim to have any knowledge of said Palmer's life and conduct all the time since said disbarment, and most of them disclaim to have any knowledge on the subject. A fair sample of letters addressed to a court called upon to set aside its judgment in so serious a matter as the disbarment of an attorney, a judgment rendered on a full hearing less than three years before the filing of the motion, is the following:

"*To the Honorable, the Judges of the Circuit Court of Fayette County:*

"Having been informed that proceedings are pending before you, the object of which is to re-instate Charles A. Palmer as an attorney at law, with authority to practice law in the several courts of this state, I feel it to be my duty to state that during the time which has elapsed, now nearly three years, since he ceased to be a member of the bar, Mr. Palmer, as I am credibly informed, has demeaned himself honorably; that he has diligently labored to take care of his family, who are dependent upon him for the means of support. In my judgment, if Mr. Palmer is re-instated, he will uprightly demean himself as a member of the bar; and that [no] good purpose will be subserved from longer continuing in force the order excluding him therefrom. Several members of the bar who have spoken to me on this subject and whose judgment is entitled to the greatest respect, have expressed the opinion that no valid reason exists for Mr. Palmer's longer exclusion from the bar."

That there appears in this letter any reason why, in any other matter, a court should set aside its deliberate judgment the writer would not claim. It is therefore fair to infer that what he has heard must have led him to believe that the judgment pronounced in this case was either too severe or unwarranted by the evidence; but we think a brief statement of the facts will fully justify the action of the court.

It having come to the knowledge of this court that Charles A. Palmer was probably guilty of misconduct in office and unprofessional conduct involving moral turpitude, a committee, consisting of Mills Gardner, John Logan and Joseph Hidy, of the Fayette county bar, was appointed to prepare and file charges and specifications against said Palmer, and they prepared and filed the following:

"*Charge First*—Said Charles A. Palmer has been guilty of misconduct in his said office of attorney and counselor at law in this:

"*First Specification*—On or about the twenty-first day of February, 1877, the said Charles A. Palmer was employed by one Sanford Sprinkle to collect a promissory note owned by Sanford Sprinkle, made payable to Jacob Black, and by him assigned to said Sanford Sprinkle, and of the amount and value of about $240.00, said note being made to Joseph Coffey and J. H. Draper; that under said employment said Palmer prosecuted in the court of common pleas of said Fayette county, an action against the makers of said note, in an action commenced in said court on said date, wherein said Sanford Sprinkle was plain-

In re Charles A. Palmer.

tiff and said Joseph Coffey, J. H. Draper and Joseph Black were defendants, and such proceedings were had in said court in said action; that on or about the twenty-third day of March, 1877, judgment was recovered therein against said defendants in favor of said plaintiff for the sum of $240.75, bearing eight per cent interest, and the further sum of $——— costs; and said Palmer caused execution to issue on said judgment, and execution was accordingly issued September 25, 1877, directed to the sheriff of Fayette county, Ohio, and delivered to him; and said execution was on said date returned by said sheriff indorsed settled in full; and on said twenty-fifth day of September, 1877, the amount collected on said execution coming to said Sanford Sprinkle, to wit, $250.93 was paid by said sheriff to said Charles A. Palmer; that said Palmer did not pay or remit said amount so collected on said judgment and execution to said Sanford Sprinkle, or to any person for him, as he should have done under the terms of his said employment, and his duties as an attorney and counselor at law; but on the contrary he converted the same to his own use, and has failed, neglected and refused to pay said sum of money, or any part thereof, to said Sanford Sprinkle or any one for him, although often requested so to do, except the sum of $80.00, which said Palmer afterwards paid to one Henry M. Cline, as guardian of said Sprinkle.

"*Second Specification*—In the year 1881, the said Chas. A. Palmer received a retainer from and entered the employment of Means, Kyle & Co., a corporation of the state of Ohio, whose principal office was located at Hanging Rock, Lawrence county, Ohio, to collect a chose in action in favor of said corporation and against one Dr. C. M. Wilson, of Washington C. H., O.; that under his said employment he collected from said Dr. C. M. Wilson for said Means, Kyle & Co. during the year 1881, the same being all collected on or before October 27, 1881, the amount of said chose in action, including interest, being $76.78; that said Charles A. Palmer did not remit said sum or any part thereof, to said Means, Kyle & Co. as he should have done under the terms of his employment and his duties as an attorney and counselor at law; but on the contrary, he converted the same to his own use, and failed, neglected and refused to pay said sum of money or any part thereof to said Means, Kyle & Co., although often requested so to do, until about the seventeenth day of November, 1887, the facts stated in this specification having been brought to the attention of the Hon. Wm. E. Evans, one of the judges of the court of common pleas for said county of Fayette, by and on behalf of said Means, Kyle & Co., and a committee having been appointed by said judge to investigate said facts, said Palmer caused to be paid to said Means, Kyle & Co., the sum of $75.00, and to procure them to forego proceedings under said charge, and said committee was thereupon discharged by said court of common pleas, and no further proceedings have been had under said charge.

"*Third Specification*—That on or about the — day of March, 1888, the said Chas. A. Palmer was employed by one Greenup DeWitt to collect a certain claim in favor of said Greenup DeWitt against The Toledo, Cincinnati & St. Louis Railroad Co.; that in said matter said Palmer associated with himself one W. P. Kappes, an attorney at law of Indianapolis, Ind.; that the said Kappes, in the month of February, 1889, collected on said claim the sum of $192.97, and on the seventh day of February, 1889, the said Kappes, retaining out of said sum so collected, the sum of $30.00, as his share of the attorney fee in said matter, remitted to said Palmer the residue of the amount collected as aforesaid, in two checks, as follows, to wit: One for the sum of $20.00, payable to the said Chas. A. Palmer as his share of the attorney fee in said matter, and the other for the sum of $142.-97, payable to said Palmer, as attorney for Greenup DeWitt, which last mentioned check said Palmer indorsed as follows: "C. A. Palmer, attorney for DeWitt;" and thereupon said Palmer received the proceeds of said check, and converted the same to his own use, and failed, neglected and refused to pay said sum of money, or any part thereof, to said Greenup DeWitt, although often requested so to do, and denied having received the same until on or about the first day of

March, 1892, at which time the said Greenup DeWitt, having in the meantime employed counsel to investigate said matter; and the said Palmer being then confronted with the evidence of his having received the said money, he thereupon paid the said Greenup DeWitt the sum of $143.00 in settlement of the said claim of the said Greenup DeWitt against said Palmer arising out of said transaction.

"*Charge Second*—And the said Charles A. Palmer has been guilty of misconduct in his said office of attorney and counselor at law, and of unprofessional conduct involving moral turpitude in this, to wit:

"*First Specification*—That prior to the twenty-ninth day of October, 1884, the said Charles A. Palmer was employed for and on behalf of one J. T. Kinner to collect a claim for damages against one Martin Plymire, growing out of the alleged seduction of the minor daughter of said Kinner, and for the services to be rendered by said Palmer in and about said claim, said Kinner paid to said Palmer the sum of seventy-five dollars, and the said Palmer entered upon the said employment; and said Kinner authorized said Palmer to settle with said Plymire for the sum of two thousand dollars; that thereupon, with intent to defraud his said client, said Palmer entered into a conspiracy with one O. H. Saxton, who was acting in said matter for said Plymire, and on said date said Palmer represented to said Kinner that he had settled said claim against said Plymire, and had received from him on said settlement the sum of fifteen hundred dollars, and no more; and that said sum was the highest sum he could obtain; and thereupon said Palmer exhibited to said Kinner a paper writing, acknowledging receipt from said Plymire of the sum of two thousand dollars, and requested said Kinner to sign the same as a voucher for the payment for said sum of fifteen hundred dollars, and represented to said Kinner that said paper writing had been prepared at a time when he, said Palmer, had expected to be able to obtain from said Plymire said sum of two thousand dollars, and said Kinner upon the faith of said representations, and relying thereon, signed said receipt, and delivered the same to said Palmer; whereas, in truth and in fact, at the time said receipt was prepared by said Palmer, as aforesaid, and when said representations were made by said Palmer to said Kinner, and when said receipt was signed by said Kinner and delivered to said Palmer, the said Palmer and Saxton had settled the said claim and demand of said Kinner against said Plymire for the sum of five thousand dollars, and had received, and then had said full sum of five thousand dollars in their possession, and said Palmer had prepared said receipt for two thousand dollars as hereinbefore alleged, for the purpose, and in such a manner as to be easily changed into a receipt for five thousand dollars; and said Palmer, thereupon, after said receipt had been signed as aforesaid, changed and altered said writing so as to recite a receipt by said Kinner of the sum of five thousand dollars; and said Palmer and Saxton divided between themselves the sum of thirty-five hundred dollars, received in excess of said sum paid as aforesaid to said Kinner.

"*Charge Third*—And the said Charles A. Palmer has been guilty of unprofessional conduct involving moral turpitude in this, to wit:

"*Specification*—Prior to the year 1890, one J. H. Patton had been appointed and qualified by the probate court of Fayette county, Ohio, as assignee for the benefit of the creditors of David T. Yates; and Mary E. Yates, wife of said assignor, about the — day of April, 1890, was asserting a claim for the value of her inchoate right of dower in said assignor's real estate, and exemptions in lieu of homestead, and in which matter said Charles A. Palmer was her attorney; and said Patton, as such assignee, had a claim against said Mary E. Yates for rents of said assigned real estate; at the same time there was pending in said court an action by Richard Brock against I. T. Carlin and others, in which action the said Mary E. Yates was defendant and cross-petitioner; and in which said Palmer was attorney for said Mary E. Yates, and as such attorney had filed for her a cross-petition setting up a judgment owned by said Mary E. Yates which was a lien upon the premises sought to be sold in said case; that on or about the — day

of April, 1890, said Charles A. Palmer, as attorney for said Mary E. Yates, agreed with said Patton, as assignee as aforesaid, that if he, said Patton, would pay to said Mary E. Yates the sum of four hundred dollars on account of her said claim against the estate of her said husband, he, said Palmer, would withdraw the said cross-petition of said Mary E. Yates, filed by him, said Palmer, in said case of *Brock* v. *Carlin*, as hereinbefore set out, and would procure his said client to release and assign to said Patton all her right to said judgment therein set up, for the satisfac: .., in so far of the claim of said J. H. Patton, as such assignee, against the said Mary E. Yates, for rents hereinbefore mentioned; and thereupon said Palmer withdrew said cross-petition, and furnished to said Patton in his own handwriting, a full settlement of account between said Patton as assignee, and Mary E. Yates, crediting to Mary E. Yates therein the amount of the judgment hereinbefore mentioned, and also caused said Mary E. Yates to sign a receipt to said Patton for the sum of $400.00, whereupon said Patton paid said sum of $400.00 as agreed with said Palmer; but afterwards, in violation of said agreement, said Palmer having ascertained that said Patton had mislaid or lost said statement, said Palmer refiled said answer in said case of *Brock* v. *Carlin*, and thereby again asserted therein said judgment for and on behalf of said Mary E. Yates, and denied the right of said Patton to the same, and on the hearing of said cause in said common pleas court said Palmer falsely testified that he had never made any such agreement with said Patton as hereinbefore set out, and that the statement of account between said Patton, assignee, and said Mary E. Yates, rendered by him to Patton, assignee, did not include a credit to said Mary E. Yates, of the amount of said judgment; and said Palmer thereupon fabricated a statement omitting said credit, which he then falsely swore was a copy of the one delivered by him to said Patton, and thereby attempted to cheat and defraud said Patton out of said sum, and might so have succeeded but for the fact that said Patton found said missing statement during the progress of said cause."

Upon these charges and specifications a trial was had at the May (1892) term of this court, and no better statement of the facts disclosed by the evidence, and of the reasons for the judgment then rendered can be given, than is found in the following opinion delivered at that time by SHEARER, J.:

"To the charges and specifications said Palmer has filed a paper writing which he denominates a plea, setting forth divers reasons why, in his opinion, said charges should not be prosecuted, and denying all charges of misconduct or unprofessional conduct.

"No plea is necessary in a proceeding of this kind. But if it were, the averments here, apart from the denials, are immaterial.

"The charges being misconduct in office and unprofessional conduct involving moral turpitude, it may be well to define what in law is meant thereby.

"Misconduct in office is defined by Anderson in his Law Dictionary, p. 680, as 'the wrongful performance of an authorized act'; and 'turpitude' as 'doing a thing against good morals, honesty or justice; unlawful conduct; infamy.' *Id.* 1064. Applying these definitions to the specifications herein, it is clear that said Palmer, if he did the acts stated therein, is guilty of both the charges alleged against him; and to determine this a brief review of the evidence adduced is necessary.

"The evidence in support of the first specification of the first charge shows that said Palmer, in February, 1877, was employed by one Sandford Sprinkle to collect a promissory note, calling for $240, given by Coffey and Draper, payable to the order of Jacob Black, and by him assigned to Sprinkle; that under his employment Palmer prosecuted an action in the court of common pleas of Fayette county against the parties to said note, on behalf of said Sprinkle, and on the 23d day of March, 1877, recovered a judgment upon said note in favor of the plaintiff, and against the defendants, for the sum of $240.75, and interest; that he caused execution to issue upon said judgment on September 25, 1877, directed to the sheriff of said county, wh· on the same day returned said writ indorsed:

'Settled in full;' and forthwith paid to said Palmer, as attorney for said Sprinkle, the avails of said judgment, to wit: $250.93.

"Palmer testified that he paid some money (how much he cannot show) to Sprinkle shortly after he received it from the sheriff, and subsequently paid Cline, the guardian of Sprinkle, $30, and afterwards, at Cline's request remitted. him $100. Said Palmer says he kept no books, but claims that upon the receipt of a letter from Cline he looked up the matter, and found he had no money in his hands belonging to Sprinkle. Why not, he does not disclose. It does not. appear that he rendered any professional services for Sprinkle other than in said action upon the note; but he claims that Sprinkle requested him to hold his money for him; that he did so, and in addition to the payments above named, he bought for him some clothing, but the amount paid therefor does not appear.

"On the other hand, H. M. Cline, who was guardian of Sprinkle, until his. death in 1882, testifies that Palmer paid him, shortly after his appointment, $30.00. and about the year 1879, $50 or $100 of the moneys in his hands belonging to Sprinkle, and promised to send the residue in a short time—as soon as he could raise it. He admitted to Cline that there was a balance in his hands due. Sprinkle.

"Cline wrote repeatedly afterward requesting Palmer to remit the balance due his ward; but received no response to any of his letters. In 1882, said ward died in the infirmary of Logan county.

"We are satisfied from the evidence that of the moneys in his hands belonging to Sprinkle, he paid only $130, and that that sum was paid to the guardian. We are also satisfied that he willfully retained the balance, and converted the same to his own use in violation of his duties as an attorney and counselor at law.

"*First Charge (Second Specification)*—As to the specification in respect to the claims of Means, Kyle & Co., we are satisfied that said Palmer is guilty of misconduct in office as an attorney and counselor at law, as laid in said specification.

"The fact that he settled said claim to prevent proceedings to disbar him from being prosecuted, does not lessen, but rather aggravates the offense.

"So also as to the—

"*First Charge—(Third Specification)*—The proof shows beyond question, and said Palmer himself admits, that in the year 1889 he received the amount of the judgment held by DeWitt against the railroad company; and that he deceived DeWitt in respect to his having the money in his possession, and persistently deceived him until he was confronted with evidence which compelled him to admit the receipt of the proceeds of said judgment.

"It is also shown, and Palmer admits, that he deposited the check given for the avails of said judgment, in a bank in Washington, to his individual credit, and forthwith checked out the same and applied it to his personal use, and neglected and refused to account for or pay over the sum due his client until compelled to do so in March, 1892.

"*Second Charge*—Misconduct in office as an attorney and counselor at law, and unprofessional conduct involving moral turpitude.

"As to the *First Specification:*—The evidence shows that in September, 1884, said Kinner, whose daughter had disappeared and whose whereabouts he could not discover, called upon Palmer, and retained him as an attorney and counselor at law, to institute criminal proceedings against said Plymire, who, he believed, was. responsible for the disappearance of his daughter; that in response to Palmer's demand he paid him a retainer of $50, and Palmer undertook said employment. Palmer subsequently informed Kinner that no proceedings against Plymire for an alleged abortion produced upon his daughter could be maintained in Ohio—the offense having been committed in Missouri; nor could a prosecution for adultery be upheld for want of evidence; that his only redress, was in a civil action for damages.

"Kinner became indignant, and declared that he did not wish to recover money, but wanted revenge upon the supposed seducer of his daughter; and inquired of Palmer 'If he owed him anything;' to which Palmer responded that 'he did not; that he had been amply paid for what he had done; but that if Kinner should desire his services further, to call, and the amount he had paid should be treated as a credit upon fees.'

"In this interview it was stated that Dr. Saxton had said that Plymire wanted to settle.

"Subsequently Kinner saw Dr. Saxton and Palmer, and during an interview with them told Palmer that he was advised that Plymire would pay $2,000 to compromise the matter, and authorized Palmer to settle for that sum if he could do so.

"Palmer says that Saxton requested him to procure Kinner's consent to a compromise if he could do so; and that thereupon he, Palmer, wrote a receipt for $5,000 as received by Kinner from Plymire in settlement of all claims growing out of the alleged criminal conduct of the latter.

"The next day Saxton returned to Palmer's office and informed him that Plymire was not satisfied with the receipt, and, as Palmer says, he then, at Saxton's request, wrote a second receipt, leaving the amount blank, and also leaving blanks for the name of the person who should pay the money, and the names of the persons for whose protection the receipt was to be given. On the same day (October 28), Saxton was at Plymire's house, in company with Mr. Daugherty, when a mortgage was executed by Plymire and wife for $5,000.00, and on their return to Washington C. H., Mr. Daugherty drew the money on the check given by the owner of the mortgage, Saxton refusing to do so, and took the same to Saxton's office, and delivered the same to Saxton, who gave him a receipt 'for parties not mentioned.' Afterward, on the same day, Palmer and Saxton went together in a buggy to Kinner's house, some miles from Washington C. H., for the purpose of settling the controversy, and procuring a receipt in full from Kinner. On the way out they stopped at Plymire's.

"On a former visit to Plymire's, Saxton had represented to Plymire that it would require $5,000.00 to settle with Kinner and that he would take no less.

"There is some conflict as to just what took place at Kinner's, but Palmer admits that in the presence of Kinner and Saxton, with pen and ink supplied by Kinner, he filled up the blanks in the receipt, inserting two thousand dollars as the amount to be paid to Kinner. Before this was done, however, Palmer and Saxton represented to Kinner that $1,500.00 was the largest sum that they could induce Plymire to pay, and yet Palmer testifies that then and there he filled the blank in the receipt with the amount of two thousand dollars. When Kinner read the receipt showing the amount to be $2,000.00, he objected, but finally signed it upon the assurance of Palmer that the amount stated was of no consequence; that they had expected to obtain $2,000.00 but had failed.

"We are also satisfied that the alteration from two thousand to five thousand in this receipt, which Palmer admits has been made, was made by Palmer himself after Kinner had read it, and when Palmer attested its execution.

"The $1,500.00 having been paid to Kinner, Saxton and Palmer left, and delivered the receipt to Plymire, it then being for $5,000.00.

"That the receipt was not altered after its delivery to Plymire is to our minds clear and conclusive, and that $5,000.00 was paid by Plymire to Saxton to pay to Kinner by way of settlement admits of no doubt.

"October 28, 1884 (the same day the receipt was signed by Kinner), Saxton deposited $3,500.00 in a bank in Washington C. H., and gave Palmer a check for $100.00, and four days later, November 1, 1884, Saxton's check for $1,600.00 was deposited by Palmer, at said bank, to the credit of his individual account.

"Palmer claims that this check was given him in settlement of fees due him from Saxton, for services rendered many years before, one of the cases having been concluded in 1876, and another in 1882. It is shown beyond controversy

that during all the period subsequent to 1876, and until he left Ohio in 1884 or 1886, Saxton was solvent and amply able to respond to all claims against him; also that he was prompt in discharging his obligations.

"It is also shown, and Palmer admits, that during all this period he was ' hard up,' and a portion of the time was financially embarrassed, and unable to meet his obligations promptly.

"This being so, is it to be believed that Palmer would have indulged a solvent, prompt paying client for more than ten years? In his financial condition he would naturally have insisted upon punctual payment. At least he would not have suffered the statute of limitations to bar his claim.

"From this evidence we are constrained to hold that while the original retainer of Mr. Palmer by Kinner was for and in respect to criminal proceedings, it was subsequently enlarged into a general retainer in all matters growing out of the conduct of Plymire toward his daughter; and that in the matter of the compromise and settlement between Plymire and Kinner, Kinner understood and believed, as did Palmer, that he, Palmer, was acting for Kinner as his attorney; and that Palmer was in fact acting as such attorney.

"We are also satisfied from the evidence that Saxton and Palmer conspired together to cheat and defraud Kinner, and that in carrying out this design they defrauded Plymire.

" Conspiracy is seldom, if ever, established by direct evidence. It is shown ordinarily by circumstances. And in this case all the circumstances show to our satisfaction that Saxton and Palmer confederated to cheat and defraud Kinner and Plymire.

" The second charge and first specification thereof are sustained.

" As to the third charge and specification: While it is clear to us from the evidence that the answer and cross-petition of Mary E. Yates was withdrawn in consequence of the agreement made by said Palmer with the assignee, and that the statement produced at the hearing, either upon the subsequent attempt to file the answer and cross-petition of Mary E. Yates, or upon distribution, was not the statement given by said Palmer to Mr. Patton; yet the evidence does not show that Palmer fabricated the statement; but on the contrary, that it was drawn by him long before at the dictation of Mr. Yates. And while it is clear that he was mistaken in his evidence upon that hearing, and that the facts were as testified to by Mr. Patton and Mr. Jones; yet we are not satisfied that he willfully testified falsely; having made two statements at the dictation of his client, and finding one of them in his office, he may have thought that was the statement referred to by Mr. Patton, and given his testimony from an examination of that paper.

" We therefore find that this charge is not sustained by the evidence.

" In consideration of the premises, the judgment of the court is that the said Charles A. Palmer be and he is hereby removed from his office of attorney and counselor at law."

Thus all of the charges and specifications save one were found to be sustained, and said Palmer was found guilty of the "wrongful performance of authorized acts," to wit: Collecting money as an attorney and failing to pay the same over to his clients; in some of the cases denying that he had received the money, and only paying over what he did in one case when threatened with disbarment, and in another when confronted with the check for the amount collected bearing his indorsement. And also of unprofessional conduct in "doing an act against good morals, honesty and justice," to wit: Conspiring to defraud, and defrauding his client by assuring him that only a certain sum could be procured in settlement of a claim, when he knew that a much larger sum had been sent for that purpose, and in changing a receipt after it had been signed, from $2,000 to $5,000, so as to deceive and defraud the other party to the settlement, and receiving and retaining half of the amount obtained by his fraudulent transaction.

These transactions cover many years, the first of them having occurred in 1877, and represent a course of misconduct covering almost all the time down to the disbarment proceeding. It was not a single act, perhaps excusable, and which years of right living might show was not indicative of the real man, but a persistent and consistent line of misconduct, finally culminating in an act which might well be called infamous.

Nor was it the act of a young man, careless and thoughtless, not as yet thoroughly grounded in all the requirements which go to make up the lawyer, but deliberate acts of a man old enough to be an example for good to the other members of the bar, taking advantage of his position to defraud his clients.

That this court has the inherent power to disbar an attorney in a proper case, we have never doubted. Such power is not derived from the statute, it being power which the legislature can neither give nor take away. It follows, therefore, that no statute is necessary to enable this court to reinstate for good cause an attorney whom it has disbarred, and it only remains to consider for what reason or reasons this should be done. While no general rule can be laid down to govern all cases, it seems to us that a good test would be this: Looking at the life and conduct of the attorney prior to the disbarment, and the reasons for the disbarment, have his life and conduct since that time been such as to satisfy the court that if restored to the bar he will be upright, honorable and honest in all his dealings? Will his restoration to the bar be compatible with a proper respect of the court for itself and with the dignity of the profession? Applying this test to the case before us, how stands it?

The disbarment trial revealed to us Palmer's professional life and conduct as far back as fifteen years prior thereto; his life for the two and one-half years since then is meagerly described in the letters submitted to us, which show only that during a year of that time he has worked industriously to support his family, the balance of the time being unknown to the writers, but described as reported to them.

He may have done all of that before his disbarment, and since then he has not been able under the guise of an attorney at law to do any of the acts which caused his disbarment.

What he would do, if similar opportunities were offered, can only be surmised, but it is not reasonable to believe that two and one-half years, however industriously or honestly spent, can possibly be sufficient to work such a reformation in one whose conduct for fifteen years at least, has been such as this record shows, as would justify a court in restoring him to the rights and privileges which he has so long abused. Such offenses ought not to be lightly condoned, or the judgment based thereon set aside from sympathy or upon mere conjecture, else the high reputation now justly accorded to the bar will become a delusion and a snare.

In support of the third ground of the motion, we have a statement from Palmer that a few months ago he made application to the Supreme Court of the state for admission to the bar at one of the periodical examinations, and was informed that the proper course for him to pursue if he wished to become again a member of the bar, was by an application to the court which had disbarred him, and therefore *ex necessitate* he filed this motion. Certainly that was right. If one court upon investigation found cause for disbarring an attorney, it would be subversive of public morals, and destructive of the courts and bar if another court could upon his passing an examination as to his legal qualifications set aside that judgment by again admitting him to the bar.

He also states that it is necessary for him to be reinstated in order to procure a promised situation which he very much desires. Thus it can be seen that the mere fact that a man is a member of the bar is an indorsement of his character and fitness. And this is an illustration of the duty of the court and bar to see to it that no unworthy man shall be allowed to carry that indorsement. If we had found anything in the record presented to us upon the motion to sat-

isfy us that by restoring Palmer to the bar no harm to the public or reproach to the bar would arise, this would be an additional reason for modifying our former judgment. But now it has no weight with us. Because we are satisfied that it has not been shown that the order of disbarment heretofore made should be vacated or modified, the motion will be overruled.

*M. Willard*, for motion.